IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROY E. MIKELL | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PHILADELPHIA YOUTH ADVOCACY | : | |
| PROGRAM, SELUA JONNY, individually | : | |
| and in her professional capacity as Director | : | |
| of the Philadelphia Youth Advocacy | : | |
| Program, and VICTOR OLMEDA, | : | |
| individually and in his professional capacity | : | |
| as Quality Assurance Investigator of the | : | |
| Philadelphia Youth Advocacy Program | : | NO.  06-3999 |

MEMORANDUM AND ORDER

**NORMA L. SHAPIRO, S.J.**                                                                **MARCH 3, 2008**

Plaintiff Roy E. Mikell ("Mikell"), a black male, filed an amended complaint alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) and § 2000e-2(a)(2) by his former employer, the Philadelphia Youth Advocacy Program ("PYAP").  Before the court is defendants' motion for partial summary judgment on Mikell's Title VII claims against PYAP (Counts I and II).  The court has federal question jurisdiction over Mikell's Title VII claims under 28 U.S.C. § 1331 and supplemental jurisdiction over Mikell's state law claims (Counts IV and V) under 28 U.S.C. § 1367(a).  The Fourteenth Amendment claim brought under 42 U.S.C. § 1983 (Count III) and the Pennsylvania Human Relations Act claim brought under 43 P.S. § 955(a) (Count VI) have been previously dismissed.  Defendants' motion for partial summary judgment will be granted on the Title VII claims in Counts I and II.  The state law claims in Counts IV and V will be dismissed without prejudice under 28 U.S.C. § 1367(c)(3).

I.      FACTS

In March 2004, Selua Jonny ("Jonny"), a supervisor at PYAP, hired Mikell as a PYAP Advocate. (Stipulated Facts ¶¶ 1, 12.) PYAP Advocates are expected to reach cultural, social, and educational goals with high-risk juvenile offenders ("clients") and their parents each week. (Jonny Dep. 8:22-9:7, Mar. 26, 2007.) The Advocates complete paperwork including activity sheets and progress notes. (Jonny Dep. 12:22-13:7.) Jonny met with Advocates every Monday to discuss their clients' progress. (Jonny Dep. 17:14-21.) Approximately twenty-five Advocates worked at PYAP; four were Hispanic, one was Caucasian, and approximately twenty were black. (Jonny Dep. 17:2-8.) Jonny assigned Mikell ten clients, a high caseload for a PYAP Advocate, because she believed Mikell could handle the work. (Jonny Dep. 15:19-16:15.) Mikell's employment was at-will. (Mikell Dep., Mar. 2, 2007, Ex. 1.)

Mikell testified that in September 2004, he took his son to the hospital to be treated for headaches. (Mikell Dep. 41:4-42:3.) The next day, Jonny spoke to Mikell and at least five others who had missed an emergency meeting the previous day. (Mikell Dep. 44:15-45:1.) At least one of the others who missed the meeting was Hispanic, and the rest were black. (Mikell Dep. 45:7-13.) Jonny told the entire group she would write them up for missing the meeting. (Mikell Dep. 45:14-45:17.) Although Mikell explained his absence from work to Jonny, she still wrote him up. (Mikell Dep. 42:9-43:20.) Jonny testified that Mikell never proved his son was in the hospital. (Jonny Dep. 41:11-12.) Mikell complained to Patty Rosati-Murphy, PYAP Chief of Staff, and Rosati-Murphy told him that as a compromise, the write-up would remain in his file temporarily but would be removed eventually. (Mikell Dep. 47:23-48:8.)

Mikell also testified that in December 2004, an office party was scheduled on a day that

Mikell had planned to go out of town. (Mikell Dep. 54:17-23.) When Mikell stated he could not attend the office party, Jonny and Rosati-Murphy told him it was a mandatory meeting. (Mikell Dep. 54:22-55:9.) Mikell testified one Hispanic employee and one black employee had been excused from the meeting, but later were told they had to attend because Mikell complained. (Mikell Dep. 55:10-57:8.) Mikell believed nothing substantial was discussed at the meeting, and that Jonny characterized it as a meeting rather than a party because Mikell had conflicting plans. (Mikell Dep. 59:6-17.) Mikell testified that the meeting lasted fifteen to twenty minutes while, on average, PYAP meetings lasted approximately an hour. (Mikell Dep. 61:2, 62:14.)

When asked at deposition whether he thought there was discrimination at PYAP, Mikell responded, "I felt as though there was always something there. I just couldn't pinpoint it by the way I was being treated there." (Mikell Dep. 29:3-6.) Mikell testified Jonny never helped him with his clients; he also alleges Jonny gave him petty criticism regarding the way he completed his paperwork and the font he used to type his reports. (Mikell Dep. 29:23-30:10; Pl.'s Pretrial Mem. 2.) Mikell testified two other black employees under Jonny's supervision told him they felt discrimination; but Mikell could not identify whether they felt the discrimination was based on race. (Mikell Dep. 37:20-41:1.)

At deposition, Jonny testified that the only problem she encountered with Mikell before his termination was Mikell's method of documenting his hours. (Jonny 18:1-18:3.) The PYAP Personnel Policy Manual states that hourly employees are eligible to work up to forty hours per week. (Mikell Dep., Ex. 2 at V-2.) According to the manual, hourly employees should not work more than the number of hours assigned by their supervisor and should not exceed the number of hours authorized by the client's service level; if an employee failed to follow these requirements,

he might be terminated.  (Mikell Dep, Ex. 2 at V-2.)  On two occasions, Jonny received a document from PYAP's Harrisburg headquarters that Mikell reported more than forty hours per week.  (Jonny Dep. 18:1-18:23.)  After Jonny received the first document from Harrisburg, she spoke to Mikell about his hours and asked another PYAP employee to explain to Mikell the proper procedure for reporting hours.  (Jonny Dep. 20:4-20:9.)  After Jonny received the second document from Harrisburg, Jonny asked her assistant director, Jamie Barnes, to show Mikell how to document his hours.  (Jonny Dep. 28:5-28:7.)  During the meeting with Barnes, Mikell stated that he did not report more than forty hours.  (Mikell Dep. 64:6-64:7.)  Barnes replied that Mikell was being investigated for blocking his hours (Mikell Dep. 69:4-69:5.), and would be written up. (Mikell Dep. 65:3-65:4.)  According to Jonny, "blocking time" consists of grouping individual time by picking up individual clients at different times and locations, but reporting the entire period of time as group time.  (Jonny Dep. 22:23-26:16.)  Jonny explained it was important to document individual time correctly in case one of the clients is arrested and needs an alibi. (Jonny Dep. 25:11-14; 48:1-20.)  Mikell testified that he originally was trained to block hours. (Mikell Dep. 69:16-69:18.)  Mikell was never disciplined for his method of documenting hours because on further investigation, PYAP determined he did not report more than forty hours. (Mikell Dep. 77:1-77:3.)

     PYAP's Employee Code of Conduct also states employees are expected to "accurately document and bill for authorized services rendered" and "[r]eport actual hours worked in an honest/non-fraudulent manner."  (Mikell Dep., Ex. 5.)  PYAP's Personnel Policy Manual provides an Advocate may be terminated for making false or inaccurate claims and for fraud in reporting hours worked.  (Stipulated Facts ¶ 2; Mikell Dep., Ex. 5.)

PYAP sends Advocates' time sheets to its Harrisburg office. (Jonny Dep. 14:2-21.) Personnel at the Harrisburg office regularly monitor all PYAP Advocates to verify they are meeting with clients and their families. (Jonny Dep. 49:15-18; 51:15-52:2.) If there is a discrepancy in the time sheets, the Harrisburg office sends an investigation document to the PYAP directors. (Jonny Dep. 49:23-50:3.) The PYAP directors then assign a quality assurance investigator to visit the family of the client whose hours are in question. (Jonny Dep. 50:11-15.)

Four or five months after Jonny and Barnes spoke to Mikell regarding his method of documenting hours, the Harrisburg office initiated an investigation of Mikell because there was a half hour discrepancy in one of his time sheets. (Jonny Dep. 29:22-30:8; 32:6-12.) Defendant Victor Olmedo ("Olmedo"), who is Hispanic, was assigned to interview the parents of Mikell's clients.[1] (Jonny Dep. 32:13-32:19.) Olmedo testified that when he interviews the family of a client, he asks when the Advocate generally meets with the client and takes handwritten notes. (Olmedo Dep. 17:5-18:12, Mar. 26, 2007.) Then the family verifies or disputes the dates reported in the Advocate's time sheets by writing a "yes" or "no" next to the dates, and the information is typed and sent back to the Harrisburg office. (Olmedo Dep. 12:22-13:19.) Olmedo was instructed to shred his handwritten notes after each investigation. (Olmedo Dep. 19:19-23.) Personnel at the Harrisburg office usually decide whether the allegations of fraud have been sustained. (Olmedo Dep. 14:8-11.)

Olmedo testified that during an interview with the mother of one of Mikell's clients, Pedro Matos, the mother stated they were on vacation on the day that Mikell reported meeting

---

[1]Victor Olmedo is identified incorrectly in the docket and caption of Mikell's amended complaint as "Victor Olmeda."

5

with Matos. (Olmedo Dep. 20:19-21:2.) In a Confidential Advocate Pay, Activity and Progress Report ("Advocate Report"), Mikell reported he was with Matos from 9:00 a.m. to 4:00 p.m. on August 23, 2005, and he met with Matos from 9:30 a.m. to 10:00 a.m. on August 24 and August 26, 2005. (Mikell Dep., Ex. 4.) According to Olmedo's notes, Matos's mother Ada Rivera stated Mikell's report was in error because Matos was on vacation from August 23 until 4:00 p.m. on August 26. Later, Mikell testified he insisted that Matos complete his hours on August 23 (Mikell Dep. 101:12-24.), and Matos did not go on vacation until after Mikell spent time with him that day. (Mikell Dep. 95:7-25, 102:1-8.) Mikell conceded that his report for August 24 was in error, as he met with Matos's grandmother rather than Matos on that day, but Mikell emphasized that he notified his supervisors of the error when they raised concerns over his Advocate Reports. (Mikell Dep. 96:6-97:14.) Mikell also conceded he did not speak with Matos's grandmother because she does not speak English, and he does not speak Spanish. (Mikell Dep. 125:15-126:16.) With respect to August 26, 2005, Mikell testified he made a typographical error and the Advocate Report should state he met with Matos from 9:30 p.m. to 10:00 p.m., not from 9:30 a.m. to 10:00 a.m.. (Mikell Dep. 97:22-98:16.)

Mikell had also reported that he was with Matos from 3:30 p.m. to 10:00 p.m. on September 19, 2005. (Mikell Dep., Ex. 4.) According to Olmedo's notes, Matos's mother, Ada Rivera, reported that Mikell was with Matos from 4:30 p.m. to 9:00 p.m. that day. Mikell also reported that he was with Matos from 3:30 p.m. to 10:00 p.m. on September 20, 2005, but Rivera reported that Mikell was with Matos from 4:00 p.m. to 9:00 p.m. that day. (Mikell Dep., Ex. 4.)

Mikell reported that he was with Matos from 3:00 p.m. to 8:00 p.m. on September 22, 2005, and from 3:00 p.m. to 3:30 p.m. on September 23, 2005. (Mikell Dep., Ex. 4.) According

to Olmedo's notes, Ada Rivera stated Mikell was not with Matos on either of those days; there is a "yes" written next to each of Mikell's time reports for September 19, September 20, September 21, and September 24, and a "no" written next to each of Mikell's time reports for September 22 and September 23. Olmedo testified that Rivera signed Mikell's Advocate Report for the week ending September 25, 2005, after Olmedo annotated them with the time discrepancies. (Olmedo Dep. 40:8-18.)

After the interview, Olmedo informed Barnes and Jonny that the discrepancy in Mikell's time sheet was fraudulent, and Mikell's full case load would be investigated; Jonny agreed. (Jonny Dep. 33:1-5; 35:23-36:6.) Jonny told Mikell to cease contact with his clients until the investigation was complete. (Jonny Dep. 34:19-24.) Olmedo met with approximately four families. (Olmedo Dep. 24:2-4.)

Olmedo found time discrepancies regarding another of Mikell's clients, Dwayne Saunders. In a September, 2005, Advocate Report, Mikell stated that he was with Dwayne Saunders from 3:00 p.m. to 10:00 p.m. on September 19, 2005. (Mikell Dep., Ex. 3.) According to Olmedo's notes, Mrs. Saunders informed Olmedo that Mikell performed services for Dwayne Saunders from 4:00 p.m. to 9:00 p.m. on September 19, 2005. At deposition, Mikell testified that Mrs. Saunders was not aware of the hours he spent with her son because Mrs. Saunders was never present when Mikell picked up Dwayne Saunders. (Mikell Dep. 84:24-85:6.)

The September, 2005, Advocate Report also stated that Mikell met with Dwayne Saunders for half an hour on September 22 and 23. (Mikell Dep., Ex. 3.) According to Olmedo's notes, Mrs. Saunders told Olmedo that Mikell did not perform any service for Dwayne Saunders on those dates. At deposition, Mikell opined that Mrs. Saunders may not have

7

understood that his services included "drive by" contacts with Dwayne Saunders.  (Mikell Dep. 87:8-20.)  Mikell explained that sometimes he drove to the Saunders's residence and conversed with Dwayne Saunders for more than 15 minutes, then rounded up his time to report half an hour of services.  (Mikell Dep. 88:5-89:25.)

On October 26, 2005, after Olmedo's investigation, Ada Rivera sent a handwritten letter to PYAP regarding Mikell.  (Olmedo Dep. Ex. 1.)  According to Rivera's letter, Olmedo told Rivera they were both Hispanic, and stated, "Come on, don't lie, I know the advocate of your son did not do the right hours."  (Olmedo Dep. Ex. 1.)  According to the letter, Olmedo also stated the other parents supported Mikell, and he suspected Mikell had a relationship with an angry and drunk woman.  (Olmedo Dep. Ex. 1.)  Ada Rivera wrote her family went on vacation on Tuesday, August 23, 2005, and returned on Friday, August 26.  (Olmedo Dep. Ex. 1.)  Rivera wrote that when she signed "no" next to the dates Mikell reported working with Pedro, she meant to verify that Mikell had indeed worked with Pedro on those dates.  (Olmedo Dep. Ex. 1.)  Rivera reported that she and Pedro were very satisfied with Mikell's work with Pedro.  (Olmedo Dep. Ex. 1.)  At deposition, Olmedo denied making unprofessional comments to Rivera, and testified that Rivera commented on his ethnicity only when he offered to do the interview in Spanish. (Olmedo Dep. 28:19-29:18.)

On October 18, 2005, Jonny gave Mikell a letter explaining he was being terminated for documenting fraudulent hours, and advising him that he could appeal the termination to Rosati-Murphy, Chief of Staff.  (Stipulated Facts ¶¶ 6-7; Mikell Dep. Ex. 6, Mar. 2, 2007.)  Mikell appealed his termination to Rosati-Murphy.  (Stipulated Facts ¶ 8.)  Mikell argued he was terminated because of a typographical error and a misunderstanding regarding Matos's vacation.

(Mikell Dep., Ex. 9.)  He also alleged Olmedo slandered his name in collaboration with Jonny and Jonny's assistant.  (Mikell Dep., Ex. 9.)  According to Mikell, Olmedo stated to Mrs. Rivera, "I see you are Hispanic just like me," and attempted to convince Mrs. Rivera to lie about Mikell. (Mikell Dep., Ex. 9.)  Mikell did not allege he was terminated because of his race or any other protected trait, and did not identify any similarly situated employee.  (Stipulated Facts ¶¶ 9-10.) Mikell testified he did not raise the issue of race discrimination before Rosati-Murphy because she was Jonny's friend.  (Mikell Dep. 116:8-116:14.)

After an investigation, Rosati-Murphy noted that Mikell "failed to document, anywhere on [his] paperwork, front or back, or mention during supervision that [Matos] was away at any time on vacation."  (Mikell Dep., Ex. 9.)  Rosati-Murphy listed inconsistencies between Ada Rivera's statements and Mikell's Advocate Reports.  (Mikell Dep., Ex. 9.)  She wrote that another client's parent disputed hours of service documented in Mikell's Advocate Report, and signed PYAP's investigation.  (Mikell Dep., Ex. 9.)  Rosati-Murphy affirmed Jonny's decision to terminate Mikell's employment.  (Stipulated Facts ¶ 11.)

Mikell believed Olmedo and Jonny schemed to investigate Mikell and report that he was not working with his clients; but Mikell did not know what motivated them.  (Mikell Dep. 78:19-79:16.)  Mikell believed Olmedo's actions were discriminatory because Olmedo investigated him twice.  (Mikell Dep. 79:25.)  At deposition, Mikell described a PYAP employee of unknown race who reported false hours; PYAP held his check but did not terminate him.  (Mikell Dep. 121:2-11.)  Mikell also stated, "I hear stories of things that people have done knowingly and got caught doing knowingly and it was okay.  You know, they got smacked on the back or whatever, smacked on the hand.  That's it."  (Mikell Dep. 120:20-120:24.)  Mikell admits he submitted

9

inaccurate pay reports in violation of PYAP policy. (Stipulated Facts ¶¶ 3-4.)

Jonny testified that a Hispanic Advocate also had reported more than forty hours a week during the same period of time Mikell had reported more than forty hours, but his employment was not terminated for that reason; rather, following a Harrisburg office investigation, the Hispanic Advocate's employment was terminated for fraud. (Jonny Dep. 39:2-40:21.) Jonny testified that the Hispanic Advocate was terminated after Mikell's termination because the Harrisburg office had requested an investigation at a later time. (Jonny Dep. 39:2-40:21.) Jonny also testified Mikell never complained to her that he was terminated because of his race. (Jonny Dep. 43:17-19.)

Olmedo testified that before investigating Mikell, Olmedo had been involved in more than fifty investigations, most of which related to allegations of fraud. (Olmedo Dep. 10:22-11:7.) Olmedo denied telling the clients he interviewed that Mikell was not a good employee. (Olmedo Dep. 21:3-7.) Olmedo also testified that Jonny never communicated with him regarding Mikell's improperly reported hours prior to Olmedo's investigation of Mikell, and he only met with Jonny once after his first investigation, and once after he had typed up his investigation reports for Jonny to sign. (Olmedo Dep. 30:22-31:8.) He also testified that before investigating Mikell, he did not know Mikell was black. (Olmedo Dep. 43:14-17.)

## II.    PROCEDURAL HISTORY

Mikell filed a complaint naming PYAP, Jonny, and Olmedo as defendants. He timely filed a first amended complaint and attached a right to sue notice from the Equal Employment Opportunity Commission. In Count I of the first amended complaint, Mikell alleges PYAP violated 42 U.S.C. § 2000e-2(a)(1). In Count II, Mikell alleges PYAP violated 42 U.S.C.

§ 2000e-2(a)(2). In Count III, a claim brought under 42 U.S.C. § 1983, Mikell alleges PYAP and Jonny violated his Fourteenth Amendment rights. In Count IV, Mikell alleges slander by PYAP and Olmedo. In Count V, Mikell alleges slander *per se* by PYAP and Olmedo. In Count VI, Mikell alleges the City of Philadelphia Prison System violated the Pennsylvania Human Relations Act, 43 P.S. § 955(a). Mikell claims one year's salary of $45,000 in damages.

Defendants moved to dismiss Mikell's first amended complaint for failure to state a claim. At a hearing before this court, Mikell withdrew Count III of his first amended complaint because neither PYAP nor Jonny were alleged to be state actors. Count VI of Mikell's complaint was dismissed because it asserted a claim against the City of Philadelphia Prison System, which is not a defendant in this action. The slander claims under Counts IV and V were severed from the remaining federal claims. Defendants' motion to dismiss was denied with respect to Counts I and II.

Following discovery, defendants moved for partial summary judgment on Counts I and II of Mikell's first amended complaint, and Mikell responded in opposition. The court heard oral argument. For the following reasons, defendants' motion for partial summary judgment will be granted, and the severed claims will be dismissed without prejudice under 28 U.S.C. § 1367(c)(3).

### III. DISCUSSION

A motion for summary judgment is granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving no genuine issue

11

of material fact exists. ABB Automation Inc. v. Schlumberger Resource Management Serv., Inc., 254 F.Supp. 2d. 479, 481 (3d Cir. 2002). The court views the underlying facts and all reasonable inferences in the light most favorable to the nonmoving party. Id. But for a nonmoving party to survive a motion for summary judgment, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of that party's case with respect to which it bears the burden of proof, then summary judgment is granted. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### A. Title VII Claims

Under Counts I and II of his amended complaint, Mikell alleges PYAP discriminated against him and terminated his employment because of his race. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), provides:

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

The plaintiff in a Title VII action carries the initial burden of establishing a *prima facie* case of racial discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). To make a *prima facie* showing, Mikell must demonstrate that: (1) he belongs to a racial minority;

(2) he was qualified for the position; (3) he was discharged; and (4) other employees not in his protected class were treated more favorably.  See Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993).  The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for plaintiff's rejection.  McDonnell Douglas, 411 U.S. at 802.  It is not necessary for the employer to prove the articulated reason actually motivated its behavior, because the plaintiff bears the burden of proving intentional discrimination.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

If the employer meets its burden, plaintiff must prove by a preponderance of the evidence that the legitimate reasons proffered by the employer were a pretext for discrimination. McDonnel Douglas, 411 U.S. at 804.  The plaintiff must point to direct or circumstantial evidence from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.  Fuentes, 32 F.3d at 764.

Assuming Mikell has set forth a *prima facie* case of race discrimination in violation of Title VII, PYAP has articulated a legitimate reason for Mikell's termination: he falsely documented meetings with clients.  PYAP's Personnel Policy Manual provides an Advocate may be terminated for fraudulently reporting hours worked.  Although Mikell reported meeting with his client, Pedro Matos, on August 24, 2005, Matos's mother stated the family was on vacation on that date.  Mikell concedes that he met with Matos's grandmother, not Matos, on August 24, but could not communicate with her because she could not speak English.  Matos's mother also confirmed time discrepancies in Mikell's Advocate Report for the week ending September 25,

13

2005.  The mother of Dwayne Saunders, another of Mikell's clients, reported that Mikell falsely documented hours for the week ending September 25, 2005.  Mikell's termination letter states he was being terminated for documenting fraudulent hours.

Since PYAP articulated a legitimate reason for Mikell's termination, the burden shifts to Mikell to show a reasonable factfinder could disbelieve PYAP's articulated reason or believe an invidious discriminatory reason was more likely than not a determinative cause of Mikell's termination.  Fuentes, 32 F.3d at 764.  To show a factfinder could reasonably disbelieve the employer's articulated reasons, Mikell's evidence "must allow a factfinder reasonably to infer that *each* of the employer's proffered nondiscriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." Id [citations omitted].  It is not sufficient to show PYAP's decision was wrong or mistaken; Mikell must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in PYAP's proffered reasons that a reasonable factfinder could rationally find them "unworthy of credence." Id. at 765.

Mikell argues Jonny's credibility is at issue because at deposition, Jonny could not remember Mikell's reaction when he was told he had to cease contact with his clients.  (Pl.'s Mem. in Response to Defs' Mot. Summ. J. 13.)  Mikell argues "[a] reasonable juror could conclude that such a thing is not the kind that an employer would forget." Id.  Evidence that Jonny could not remember Mikell's reaction does not undermine her testimony about PYAP's internal procedures, its investigation of Mikell, or Mikell's documentation of hours.  Mikell's argument also is not relevant to show PYAP's termination of Mikell's employment for fraudulent documentation of hours was mere pretext.

Mikell points to Ada Rivera's letter as evidence that Olmedo and Jonny conspired to accuse Mikell of fraudulently documented hours.  According to Rivera's letter, Olmedo noted that both he and Rivera were Hispanic, and urged Rivera to report that Mikell did not spend the documented hours with her son.  Rivera also stated she meant to report Mikell had spent time with her son on September 22 and September 23, 2005, when she wrote "no" next to those dates.  But Rivera's letter also states she and her family were away on vacation on August 24, 2005, on the same date Mikell had reported meeting with her son Pedro Matos.  Assuming the statements in Rivera's letter are true, the letter fails to contradict PYAP's assertion that Mikell was terminated for fraudulently documenting hours, because it confirms that Pedro Matos was on vacation on the same date Mikell claimed to have met with him.  Olmedo may have used overly aggressive interview tactics, or spoken of his shared race with Rivera, but that does not undermine the evidence that PYAP terminated Mikell's employment for falsely documenting hours, because Olmedo did not make the decision to terminate Mikell's employment.  See Gomez v. Allegheny Health Services, Inc., 71 F.3d 1079, 1085 (3d Cir. 1995) ("stray remarks by non-decision makers . . . are inadequate to support an inference of discrimination by the employer").  Mikell has not pointed to any evidence from which a reasonable factfinder could infer that PYAP's articulated reason for terminating his employment was pretextual.

In order to rebut PYAP's articulated reason, Mikell also may show an invidious discriminatory reason was more likely than not a motivating or determinative cause of PYAP's action.  Fuentes, 32 F.3d at 764.  The court may consider whether PYAP in the past had subjected Mikell to unlawful discriminatory treatment, whether PYAP treated other, similarly situated persons not of Mikell's protected class more favorably, or whether PYAP has

discriminated against other members of Mikell's protected class or other protected categories of persons. See id. at 765.

Mikell argues the timing of his termination was discriminatory, because a Hispanic Advocate was terminated for fraudulently reporting hours months after Mikell was terminated. Mikell argues the Hispanic Advocate should have been terminated at the same time as Mikell. Jonny testified the Harrisburg office sent an investigation document for the Hispanic Advocate after sending an investigation document for Mikell. The jobs of both Mikell and the Hispanic Advocate were terminated for fraudulent documentation of hours. Evidence that the Hispanic Advocate was terminated later is not sufficient to show favoritism or that PYAP more likely than not terminated Mikell's employment because of race.

Mikell argues he was subject to unlawful discriminatory treatment before he was terminated. He points to evidence that he was written up for missing a meeting in September, 2004, when he took his son to the hospital. But Mikell conceded at deposition that a Hispanic employee was also told he would be written up for missing the same meeting, and Rosati-Murphy compromised with Mikell by telling him the write-up would not remain in his file permanently. Mikell also testified he was required to attend an unimportant office party or meeting on a day that he had planned to go out of town. But he conceded a Hispanic employee also was required to attend the party or meeting after Mikell complained. Mikell alleges he was subject to unlawful discrimination because Olmedo investigated him twice. After receiving an investigation document from the Harrisburg office, Olmedo interviewed Ada Rivera, the mother of Pedro Matos, and Mrs. Saunders, the mother of Dwayne Saunders. The fact Olmedo conducted a thorough investigation does not support an inference of discrimination. Mikell has

not pointed to any evidence that he was subject to unlawful discriminatory treatment or that Hispanic Advocates were treated more favorably.

Although it is unclear, Mikell's amended complaint may also assert a hostile work environment claim against PYAP. Under Title VII, Mikell must show: (1) he suffered intentional discrimination because of his race; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability. Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005). Offhand comments and isolated incidents, unless extremely serious, are not sufficient to sustain a hostile work environment claim. Id. Mikell has not pointed to evidence of intentional race discrimination. Although he was required to attend meetings and was written up for failing to do so, PYAP's Hispanic employees were subject to the same treatment. Mikell testified Jonny did not help him with his work, but did not point to any evidence that Jonny helped Hispanic employees with their work. Mikell also reported feeling "as though there was always something there," and testified that two other black employees felt discrimination; but he could not point to any evidence that this perceived discrimination was based on race. Mikell's vague allegations are not sufficient evidence to support a hostile work environment claim.

Defendants' motion for partial summary judgment on Counts I and II of Mikell's amended complaint will be granted.

### B.   Slander Claims

A federal district court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). In

17

deciding whether to exercise supplemental jurisdiction, the court should consider "judicial economy, convenience, and fairness to the litigants." United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); Growth Horizons, Inc. v. Delaware County, Pennsylvania, 983 F.2d 1277, 1284 (3d Cir. 1993).  The court has dismissed all of Mikell's federal claims and has not heard the evidence necessary to decide Mikell's state law slander claims.  Judicial economy is served if Mikell's state law slander claims are brought in state court.  The court declines to exercise jurisdiction over Mikell's slander claims.  Counts IV and V of Mikell's first amended complaint will be dismissed without prejudice.

**IV.   CONCLUSION**

Defendants' motion for summary judgment will be granted on Counts I and II of Mikell's first amended complaint.  The remaining Counts IV and V of Mikell's first amended complaint will be dismissed without prejudice under 28 U.S.C. § 1367(c)(3).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROY E. MIKELL** | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **PHILADELPHIA YOUTH ADVOCACY** | : | |
| **PROGRAM, SELUA JONNY,** individually | : | |
| and in her professional capacity as Director | : | |
| of the Philadelphia Youth Advocacy | : | |
| Program, and **VICTOR OLMEDA,** | : | |
| individually and in his professional capacity | : | |
| as Quality Assurance Investigator of the | : | |
| Philadelphia Youth Advocacy Program | : | **NO. 06-3999** |

**ORDER**

**AND NOW**, this 3rd day of March, 2008, upon consideration of defendants' motion for partial summary judgment and plaintiff's response, following a hearing at which both parties were heard, for the reasons stated in the accompanying memorandum, it is **ORDERED** that:

      1.     Defendants' motion for partial summary judgment (paper no. 21) on Counts I and II is **GRANTED**.

      2.     Counts IV and V of Mikell's first amended complaint are **DISMISSED** without prejudice under 28 U.S.C. § 1367(c)(3).

      3.     The Clerk of Court shall replace defendant Victor Olmeda, individually and in his professional capacity as Quality Assurance Investigator of the Philadelphia Youth Advocacy Program, in the caption with "Victor Olmedo, individually and in his professional capacity as Quality Assurance Investigator of the Philadelphia Youth Advocacy Program."

      4.     The Clerk of Court shall mark this action **CLOSED**.

      /s/ Norma L. Shapiro
      Norma L. Shapiro, S.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROY E. MIKELL** | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **PHILADELPHIA YOUTH ADVOCACY PROGRAM, SELUA JONNY,** individually and in her professional capacity as Director of the Philadelphia Youth Advocacy Program, and **VICTOR OLMEDA,** individually and in his professional capacity as Quality Assurance Investigator of the Philadelphia Youth Advocacy Program | : : : : : : : : | **NO. 06-3999** |

## JUDGMENT

**AND NOW**, this 3rd day of March, 2008, the court having granted partial summary judgment in favor of defendant Philadelphia Youth Advocacy Program on Counts I and II, and the claims against all other defendants having been withdrawn or dismissed, it is **ORDERED** that judgment is entered in favor of defendant Philadelphia Youth Advocacy Program.

/s/ Norma L. Shapiro
Norma L. Shapiro, S.J.